UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALERIS ALUMINUM CANADA L.P. and
ALERIS ALUMINUM KOBLENZ GmbH,
    Plaintiffs,

v.                                                    Case No. 09-10490

VALEO, INC.,                                   Honorable Patrick J. Duggan
    Defendant.
_____/

VALEO, INC.,
    Counter-Plaintiff,

v.

ALERIS ALUMINUM CANADA L.P.,
    Counter-Defendant.
_____/

**OPINION AND ORDER**
At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on June 8, 2010.

PRESENT:        THE HONORABLE PATRICK J. DUGGAN
                          U.S. DISTRICT COURT JUDGE

Aleris Aluminum Canada L.P. and Aleris Aluminum Koblenz GmbH filed this lawsuit alleging various contract related claims against Valeo, Inc. ("Valeo") on February 9, 2009. On April 2, 2009, Aleris Aluminum Koblenz GmbH voluntarily dismissed its claims. On April 6, 2009, Valeo filed an answer, affirmative defenses, and counterclaims against Aleris Aluminum Canada L.P. ("Aleris"). On May 4, 2010, with leave of the Court, Valeo amended its counterclaims. Now pending is Aleris's motion for summary judgment as to its breach

of contract claim and all of Valeo's counterclaims. The motion has been fully briefed and the Court heard oral argument on May 26, 2010.

## I. Facts and Procedural Background

Prior to the filing of this lawsuit, Aleris and Valeo were engaged in a business relationship whereby Aleris manufactured rolled aluminum products for purchase by Valeo. Valeo then used the rolled aluminum products to fabricate various parts for Chrysler, Ford, and General Motors.

Generally, the arrangement between Aleris and Valeo began with a purchase order assigning product numbers and prices for the various rolled aluminum products. (*See* Aleris's Mot. Ex. 3.) The purchase order also reflected an invoice and delivery address, listed the terms of payment, and incorporated Valeo's "Purchasing Terms and Conditions." (*Id.*) Aleris periodically updated its prices based on variations in metal costs but the parties did not physically create a new purchase order with each price adjustment. (Aleris's Mot. Ex. 1 at 66.) The purchase order itself failed to list purchase quantities and made no reference to Valeo's requirements. (*See* Aleris's Mot. Ex. 3.) Meanwhile, Valeo's Purchasing Terms and Conditions provided, among other things, that "Valeo reserves the right to terminate any purchase order for its sole convenience, without reason or cause." (Valeo's Resp. Ex. 22 ¶ 13.B.) In the event of termination, Aleris was required to immediately stop all work and was only entitled to recover "a reasonable termination charge consisting solely of a percentage of the order price reflecting the percentage of the work performed prior to the notice of termination." (*Id.*)

To accommodate actual purchases Valeo sent Aleris weekly forecasts indicating its

2

estimated needs for the products identified in the purchase order. (*See* Aleris's Mot. Ex. 5.) The forecasts provided weekly estimates for the upcoming three months and then monthly estimates for the following eight months, for a total 11-month forecast. (*Id.*) Aleris used the forecast amounts along with historical data to plan its production of the various products. (*See* Valeo's Resp. Ex. 5 at 98.) Nothing in the forecasts, however, obligated Valeo to purchase the quantities contained therein. (*See* Aleris's Mot. Ex. 5.)

Having planned its production based on the forecasts and historical data, Aleris then delivered finished products to a third-party consignment warehouse. (Aleris's Mot. Ex. 1 at 55-56.) Valeo, in turn, retrieved the products directly therefrom resulting in a "release" from consignment. (*Id.*) Aleris ultimately received notice of the released amounts and products and invoiced accordingly. (*Id.*) The quantities associated with Valeo's actual releases ranged between zero and 300% of the amounts in Valeo's forecasts. (Aleris's Mot. Ex. 10 at 94-95.) As a general matter, Aleris understood that Valeo's actual purchases would fluctuate with the needs of Valeo's car manufacturer clients. (*See* Valeo's Resp. Ex. 5 at 170, Ex. 6 at 48.) If at any time Valeo required a different product or an unusual amount of product, Valeo and Aleris entered into individual "spot-buy" agreements to deal with the special need. (*See* Valeo's Resp. Ex. 6 at 56.) These arrangements were separate from Valeo's normal practice of retrieving products under the terms of the purchase order as described above. (*See id.*)

To facilitate and formalize their arrangement, Aleris and Valeo entered into a "Business Agreement" in 2007. (*See* Valeo Resp. Ex. 38.) The 2007 Business Agreement included pricing standards, payment terms, delivery arrangements, and estimates of Valeo's needs for

3

each product. (*Id.*) Although the agreement again did not require that Valeo purchase the estimated volumes or any set minimum, it did make Valeo liable for a maximum of 12 weeks' material produced or in-process based on Valeo forecasts. (*Id.*) The agreement indicated effective dates of January 1, 2007, to December 31, 2007, but the parties agreed to apply its terms through March 31, 2008.[1] (*See* Valeo Resp. Exs. 38, 41.)

In February 2008 the parties also signed a "Logistic Protocol," retroactively applicable to December 1, 2007, that provided additional detail regarding "the delivery process applicable to the Products supplied by [Aleris] to [Valeo] under the Business Agreement." (Valeo's Resp. Ex. 48.) The parties contemplated that the termination date for the Logistic Protocol would be December 31, 2009, based on a future business agreement; in any event, though, the Logistic Protocol was to automatically terminate on termination of the "Business Agreement." (*Id.*) The Logistic Protocol provided, among other things, that Aleris would "provide flexibility in line with Valeo's customers schedule changes" and that Valeo would take title to and pay for any product stored in the consignment warehouse for three months. (*Id.*)

Anticipating the termination of the 2007 Business Agreement, the parties also began to negotiate a new Business Agreement in early 2008. The parties expected that the new agreement would run from May 1, 2008, to December 31, 2010. (*See* Valeo's Resp. Ex. 39.) The 2008-2010 Business Agreement was similar in most respects to the 2007 Business Agreement but also explored the expansion of the relationship between the parties both in

---

[1] Both parties did not actually sign the 2007 Business Agreement until June 13, 2007, but they agreed to its retroactive application. (Valeo's Resp. Ex. 28.)

4

the number of products and the number of Valeo facilities supplied by Aleris.[2] (*See* Valeo's Resp. Ex. 42.)

With a few exceptions, the 2008-2010 Business Agreement was fully negotiated and, once the 2007 Business Agreement expired, the parties continued their normal arrangements with the purchase order, forecasts, and releases from the consignment warehouse as described above but using the pricing terms of the 2008-2010 Business Agreement. (*See* Valeo's Resp. Ex. 43.) By June 2008 Aleris had also begun the necessary trials to develop the business on the new products desired by Valeo. (*Id.*) Even so, the parties never signed the 2008-2010 Business Agreement. (*See* Valeo's Resp. Ex. 39.) Aleris expressed its desire to expand its business with Valeo and its intentions of entering the 2008-2010 Business Agreement but also explained on multiple occasions that it could not sign the document until it successfully negotiated a new contract with its labor union. (*See* Valeo's Resp. Exs. 43, 46, 47, 54.)

At some point in 2008, Aleris's prior contract with its labor union had expired and negotiations were not going well. In various communications Aleris indicated to Valeo that it was "in a special situation due to [its] union negotiation," had received a union counter-offer that was "far from satisfactory to [Aleris's] management," was "running out of time," and had a "very tough challenge on [its] hands with the labor contract negotiation." (*Id.*) On July 2, 2008, Aleris locked out its union employees and sent a letter to Valeo declaring "a state of Force Majeure in respect of [Aleris's] ability to continue supplying product to [its]

---

[2]During negotiation of the 2008-2010 Business Agreement, Aleris rejected a clause incorporating Valeo's Purchasing Terms and Conditions. (*See* Valeo's Resp. Ex. 46.)

customers." (Valeo's Resp. Ex. 11.) On July 3, 2008, Valeo responded that, if Aleris failed to ship supplies as provided for in the parties' purchase order, Aleris would be in breach of Valeo's Purchasing Terms and Conditions. (Valeo's Resp. Ex. 57.) On July 12, 2008, Aleris sent a second letter informing Valeo of the permanent closure of its facility. (Valeo's Resp. Ex. 12.) Thereafter, Valeo was able to purchase the supplies remaining at the consignment warehouse and some of the products that were in-process at the time of the lockout but otherwise had to seek new suppliers for its needs. (*See* Valeo's Resp. Br. at 8 n.3.)

During the summer months of 2008, Valeo retrieved a minimum of $1,473,692.24 of product from the consignment warehouse. (*See* Aleris's Mot. Ex. 1 at 25, Ex. 2 at Ex. 1.)[3] In light of Aleris's termination of the business relationship, Valeo refused to pay for those products. (*See* Aleris's Mot. Ex. 1 at 19-21.) Valeo asserts that its Purchasing Terms and Conditions allow it to setoff damages caused by Aleris's termination against amounts owed for the released product. (*Id.*) Valeo's Purchasing Terms and Conditions specifically provide that, "[i]n addition to any right of setoff provided by law, Valeo may automatically deduct from payments made to [Aleris] any and all sums due or to become due by [Aleris] for whatever reason." (Valeo's Resp. Ex. 2 ¶ 6.4.) Valeo believes that its right to setoff arose based on Aleris's refusal to continue meeting its requirements, Aleris's inappropriate declaration of a "force majeure" under ¶ 20.B of the Purchasing Terms and Conditions,[4] and

---

[3]This exhibit actually indicates that Valeo's books reflect releases of $1,481,746.46 worth of product. The approximately $8,000 discrepancy between Aleris's numbers and Valeo's has not been completely resolved. Aleris, however, only seeks to recover the amount reflected in its books (i.e. the lower amount).

[4]¶ 20.B provides:

6

Aleris's failure to provide appropriate notice of a labor dispute pursuant to ¶ 5.5 of the Purchasing Terms and Conditions.[5] (*See* Valeo's Am. Counterclaims.) Valeo maintains that the damages it incurred as a consequence of Aleris's conduct exceed the value of the products released in the summer 2008. (*See* Valeo's Resp. Ex. 59.)

Given Valeo's refusal to pay, Aleris filed the present lawsuit on February 9, 2009. Aleris seeks the same recovery in each of its asserted claims: the value of the released product plus interest, costs, and attorney fees. (*See* Compl.) As such, Aleris's separate claims for breach of contract, account stated, and unjust enrichment merely present alternative theories of recovery for the requested relief. (*See id.*) Meanwhile, by way of its amended counterclaims, Valeo seeks to setoff the entirety of Aleris's requested relief and recover its damages in excess of that amount plus costs and attorney fees. (*See* Valeo's Am.

---

> Force Majeure. Any delay or failure of either party to perform its obligations shall be excused if caused by an extraordinary event or occurrence beyond the control of the nonperforming party and without the nonperforming party's fault or negligence, such as acts of God, fires, floods, windstorms, explosions, riots, natural disasters, wars and sabotage.

(Valeo's Resp. Ex. 22.)

[5] ¶ 5.5 provides:

> Supplier will notify Valeo immediately of any actual or potential labor dispute delaying or threatening to delay timely performance of the purchase order, and will provide Valeo with all relevant information. Supplier will notify Valeo six (6) months in advance of the expiration of any current labor contract(s). Prior to the expiration of any such labor contract, Supplier will store, at its expense, a minimum thirty (30) day inventory of finished Supply at a warehouse unaffected by the labor contract.

(Valeo's Resp. Ex. 22.)

Counterclaims.) Valeo presents three alternative theories for its requested relief: breach of contract, breach of contract implied in fact, and promissory estoppel. As previously indicated, Aleris now seeks summary judgment on its breach of contract claim and all of Valeo's counterclaims.

**II. Standard of Review**

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable

inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

**III. Aleris's Claims**

Aleris's breach of contract claim against Valeo is largely undisputed. Valeo acknowledges receipt of at least $1,473,692.24 worth of Aleris products in the summer 2008 and does not specifically challenge Aleris's request for interest at the rate of 5% per annum from the dates that invoices should have been paid until final judgment. Valeo maintains, however, that the Court must deny summary judgment on Aleris's claim so long as its counterclaims remain pending. Valeo argues that Aleris cannot be entitled to summary judgment if Valeo's failure to pay reflects a legitimate exercise of its setoff rights under applicable law and the Purchasing Terms and Conditions. Aleris responds that any right to setoff is a counterclaim, rather than a defense, and necessarily requires an acknowledgment that Valeo owes money to Aleris, making summary judgment appropriate.

While setoff counterclaims should generally be adjudicated within a single lawsuit so that final judgment accounts for any setoff rights, *see Valley Disposal Inc. v. Cent. Vt. Solid Waste Mgmt. Dist.*, 113 F.3d 357, 364-66 (2d Cir. 1997), this principle does not necessarily require that all claims and counterclaims be disposed of by a single order within the litigation. *See Harris Thomas Indus., Inc. v. ZF Lemforder Corp.*, No. 3:06CV190, 2007 WL 3071676, at *6 (S.D. Ohio Oct. 19, 2007) (granting partial summary judgment on plaintiff's breach of contract claim though a genuine issue of fact remained as to one of defendant's counterclaims). In this case, however, the Court need not decide whether the existence of

pending counterclaims precludes summary judgment on Aleris's claim. For reasons discussed in more detail below, the Court concludes that Valeo's counterclaims fail as a matter of law. As such, all pending claims will be resolved by this single opinion and order.

Aleris met its burden of demonstrating an absence of a genuine issue of material fact as to the amount of product retrieved by Valeo in the summer 2008. (*See* Aleris's Mot. Ex. 1 at 25, Ex. 2 at Ex. 1.) Valeo presents no argument in opposition to the amount of relief requested by Aleris. Furthermore, Michigan law supports Aleris's request for interest at the rate of 5% per annum from the dates that invoices should have been paid until final judgment. *See* Mich. Comp. Laws Ann. §§ 438.7, 438.31; *see also Holland v. Earl G. Graves Publ'g Co., Inc.*, 33F. Supp. 2d 581, 583-84 (E.D. Mich. 1998). Therefore, the Court grants Aleris summary judgment on its breach of contract claim in the amount $1,473,692.24 plus 5% interest as provided for by Michigan law.[6]

## IV. Valeo's Counterclaims

As previously indicated, Valeo presents three alternative grounds for its counterclaim recovery. In its present motion, Aleris argues that the breach of contract counterclaim fails because the parties did not have a requirements contract and, even if they did, Aleris provided proper notice of termination. For the same reasons that Aleris argues the parties did not have a requirements contract, Aleris also argues that the implied in fact contract and promissory estoppel counterclaims fail. The Court considers each claim in turn.

### A. Breach of Contract

---

[6]This holding renders moot Aleris's alternative claims for account stated and unjust enrichment.

Aleris disputes the existence of a requirements contract on grounds that the documents relied upon by Valeo lack quantities, duration, and mutuality of obligation. Valeo counters that requirements contracts are recognized in the law as imposing an obligation on the purchaser to act in good faith in regard to quantities purchased. Valeo argues that such a contract is evidenced between Aleris and Valeo by the purchase order, the Purchasing Terms and Conditions, weekly forecasts, the 2007 Business Agreement, the Logistic Protocol, negotiations for the 2008-2010 Business Agreement, course of performance, industry standards, Aleris's attempt to declare a force majeure, and other communications between Aleris and Valeo or internal to Aleris. Having reviewed all of the record evidence, the Court concludes that there was no requirements contract in place at the time Aleris locked out its union workers.

Under Michigan law a contract between parties "is not to be found in its express terms alone but includes their bargain in fact as found in their language or by implication from other circumstances." *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 363 (3d Cir. 1987) (*citing* Mich. Comp. Laws Ann. § 440.1201(3)). Any such contract, though, must include a quantity term. *See* Mich. Comp. Laws Ann. § 440.2201 cmt. 1. The quantity term may be measured by all or some of "the output of the seller or the requirements of the buyer" in which case the quantity "means such actual output or requirements as may occur in good faith . . . ." Mich. Comp. Laws Ann. § 440.2306(1); *see also Gen. Motors Corp. v. Paramount Metal Prods. Co.*, 90 F. Supp. 2d 861, 873 (E.D. Mich. 2000). For this reason, the quantity need not always be precisely stated; once some quantity term is given, "parol evidence is admissible to show what the parties intended as to the exact quantity." *In re*

*Estate of Frost*, 460 Mich. App. 556, 561, 344 N.W.2d 331, 334 (1984) (quoting *Alaska Indep. Fishermen's Mktg. Ass'n v. New England Fish Co.*, 548 P.2d 348 (1976)). Nonetheless, "where the writing relied upon to form the contract of sale is totally silent as to quantity, parol evidence cannot be used to supply the missing term." *Id.*

Although some courts have found an issue of fact as to the existence of a requirements contract given evidence of blanket purchase orders and releases, *see, e.g.*, *Johnson Controls, Inc. v. TRW Vehicle Safety Sys., Inc.*, 491 F. Supp. 2d 707 (E.D. Mich. 2007), the totality of the circumstances in this case conclusively indicate that there was no such contract at the time Aleris locked out its union workers and ceased supplying Valeo. None of the primary documents that Valeo cites in support of its counterclaim—the purchase order, the Purchasing Terms and Conditions, and the weekly forecasts—obligated Valeo to purchase any quantity of products, whether measured in terms of a set number or merely as some or all of Valeo's requirements. In fact the purchase order makes no reference to quantities and the Purchasing Terms and Conditions merely contemplate that, in some of Valeo's business relationships, "deliveries are specified to be in accordance with Valeo's written releases." (Valeo's Resp. Ex. 13, Ex. 22 ¶ 2.3.)

These facts distinguish the present case from others wherein courts have found either a valid requirements contract or a question of fact as to the existence of such a contract. In *Johnson Controls, Inc. v. TRW Vehicle Safety Systems, Inc.*, for example, the evidence included a blanket purchase order that defined the purchase quantity as "AS REL"—meaning as indicated in releases. 491 F.Supp. 2d at 709-10. Additionally, the purchase order in *Johnson Controls* incorporated "Global Terms" that provided, "for consideration of U.S. $10

to be paid by Buyer upon expiration or termination of the Order, Seller grants to Buyer an irrevocable option during the term of the Order to purchase Supplies in such quantities as determined by Buyer and identified as firm orders in material authorization releases . . . ." *Id.* at 710. These documents provided some, albeit imprecise, quantity term that could then be supplemented with parol evidence. *Id.* at 717-18. This gave rise to a question of fact as to the existence of a requirements contract. *Id.* at 719-20; *see also GRM Corp. v. Miniature Precision Components, Inc.*, No. 06-15231-BC, 2008 WL 82224 (E.D. Mich. Jan 8, 2008) (finding a question of fact where the request for quotation by the buyer provided an estimated annual quantity and the supplier provided a feasibility sign-off indicating its ability to meet all of the buyer's "specified requirements").

Looking to Valeo's weekly forecasts in the present case does not resolve the lack of a quantity term either; although the forecasts estimated Valeo's needs, they did not bind Valeo to make any specific purchase. (*See* Valeo's Resp. Ex. 25.) Aleris did not know for sure how much product Valeo would purchase until Valeo retrieved products from the consignment warehouse, issuing a "release" of those products. In fact, Aleris maintains that Valeo's releases ranged from zero to 300% of the quantities set forth in the weekly forecasts and Valeo presents no evidence to the contrary. (*See* Aleris's Mot. Ex. 10 at 94-95; *see also* Valeo's Resp. Ex. 52 (showing that Valeo regularly retrieved less product than forecast during a 10-week span in 2007).) This again distinguishes the present case from others where requirements contracts have been found to exist; in such cases the buyers issued firm releases, committing to purchase the quantity of product specified therein, and then the supplier would fill that request. *See, e.g.*, *Metal One Am., Inc. v. Ctr. Mfg., Inc.*, No. 1:04-

13

CV-431, 2005 WL 1657128 (W.D. Mich. July 14, 2005) (considering blanket purchase orders with estimated volumes followed by "firm releases" and "course of performance" evidence indicating a requirements contract). And even where firm releases, as opposed to mere forecasts, have been involved, the Sixth Circuit applying Michigan law held on at least one occasion that a blanket purchase order with no reference to quantity could not give rise to a requirements contract. *Advanced Plastics Corp. v. White Consol. Indus., Inc.*, No. 93-2155, 1995 WL 19379 (6th Cir. 1995).[7] Therefore, the Court concludes that the purchase order, the Purchasing Terms and Conditions, and the weekly forecasts in this case fail to give rise to a valid requirements contract between the parties. And, given the lack of a quantity term, Valeo should not be permitted to use parol evidence to establish the existence of a requirements contract. *See In re Estate of Frost*, 460 Mich. App. at 561, 344 N.W.2d at 334.

Even so, the additional evidence cited by Valeo merely reinforces the Court's conclusion that there was no requirements contract at the time Aleris locked out its union workers. While it appears that Valeo believes the parties had a requirements contract under the terms of the 2007 Business Agreement and the Logistic Protocol, those agreements expired, at the latest, March 31, 2008. (*See* Valeo Resp. Exs. 41, 48.) Valeo argues, though, that Aleris's continued performance after March 31, 2008, under the pricing terms of the

---

[7]*See also in re Dana Corp.*, No. 06-10354 (BRL), 2007 WL 4105714 (Bankr. S.D.N.Y. Nov. 14, 2007) (concluding that a blanket purchase order for an unspecified duration and an unspecified quantity containing a clause allowing the buyer to terminate "for convenience at any time" could not give rise to a requirements contract under Michigan law); *Harris Thomas Indus., Inc. v. ZF Lemforder Corp.*, No. 3:06CV190, 2007 WL 3071676 (S.D. Ohio Oct. 19, 2007) ("[T]he Sixth Circuit has held that where there is a blanket purchase order in effect, but material releases are issued which govern supply and delivery, the only contracts are the releases that have been accepted between the parties.").

pending 2008-2010 Business Agreement established an implied extension of any such requirements contract.

It is true that "Michigan law permits a contract to be renewed implicitly . . . . However, if the evidence suggests contrary intentions, a contract does not necessarily continue and is not implicitly renewed." *Iverson Indus., Inc. v. Metal Mgmt. Ohio, Inc.*, 525 F. Supp. 2d 911, 917 (E.D. Mich. 2007). As such, implicit renewal cannot be inferred in this case where Aleris repeatedly advised Valeo and Valeo acknowledged that Aleris's willingness to enter into a new agreement depended on the successful negotiation of a new labor contract. (*See* Valeo's Resp. Exs. 43, 46, 47, 54.)

Additionally, the parties' course of performance fails to establish the existence of a requirements contract.[8] Though it appears that, in the course of their normal business arrangement, Aleris may have, in fact, supplied Valeo's requirements, this does not necessarily mean that Aleris had a continuing obligation to do so. Indeed, the fact that the parties executed the 2007 Business Agreement and were negotiating a 2008-2010 Business Agreement indicates that they did not contemplate their regular course of performance to rise to the level of a requirements contract that imposed mutual, continuing obligations on the parties.

As to various communications between Aleris and Valeo and internally between Aleris employees, some merely reflect Aleris's attempts to facilitate a positive business relationship with Valeo while others reflect that the parties did have a more formal arrangement under the

---

[8]Valeo's own Purchasing Terms and Conditions actually prohibit consideration of course of dealing or usage of trade evidence. (Valeo's Resp. Ex. 22 ¶ 1.)

15

2007 Business Agreement and Logistic Protocol. (*See* Valeo's Resp. Exs. 18, 21, 24, 30, 34, 50, 52, 53.) Two communications in particular, however, are worth mentioning separately. In March 2008 the Vice President overseeing Aleris's sales force requested that Aleris's sales manager send him a list of current contracts with the company's major automotive customers. (Valeo's Resp. Ex. 45.) In response the sales manager provided a list indicating a "price agreement" with Valeo lasting until December 31, 2010. (*Id.*) In the comment section of the list, the sales manager further indicated as to Valeo, "Using Customer's contract as a base to negotiate contract document." (*Id.*) Valeo cites this exchange as evidence that Aleris acknowledged the existence of an on-going requirements contract. The Court disagrees. Considering the entirety of the exchange in combination with the circumstances surrounding it, the evidence merely reflects the on-going negotiation of the 2008-2010 Business Agreement in March 2008 with application of the pricing terms of that agreement to sales taking place in the interim.

In the second exchange worth mentioning, Andreas Gondorf, an employee of "Aleris Aluminum Germany,"[9] concluded an e-mail to the Vice President overseeing Aleris's sales force by stating, "Personal note: I'm still very much concernce [sic] about the arguments used; i.e. 'no contracts in place'. We try to keep this out of our discussions, because this will have a serious impact to existing relationsships [sic] and common practise [sic] in the market." (Valeo's Resp. Ex. 60.) This email was sent two days after the lockout. (*See id.*)

---

[9]Andreas Gondorf was identified as such by defense counsel at the Court's May 26, 2010, hearing. Therefore, it does not appear that Gondorf is an employee of the actual party to this action—Aleris Aluminum Canada L.P.

It is not clear from this email whether Gondorf actually believes that Aleris had requirements contracts with any of its customers, let alone Valeo. But even if he does have such a belief, a single email out of dozens from a single employee of a sister company expressing a personal opinion on a legal matter is not dispositive of the relationship between the parties to this action. *See in re Dana Corp.*, No. 06-10354 (BRL), 2007 WL 4105714, at *3 (Bankr. S.D.N.Y. Nov. 14, 2007) (applying Michigan law). Ultimately none of the communications cited by Valeo establish the existence of a requirements contract or even create a question of fact as to that issue, especially in view of the deficiencies of the documentary evidence, Aleris's refusal to enter the 2008-2010 Business Agreement without a new labor contract, and other surrounding circumstances described above. Therefore, the Court grants Aleris summary judgment as to Valeo's breach of contract counterclaim.[10]

## B. Breach of Contract Implied in Fact[11]

Next Valeo maintains that, even if it did not have an express requirements contract with Aleris, the parties had such a contract implied in fact. "Under Michigan law, an implied-in-fact contract arises between parties when those parties show a mutual intention to contract." *Kingsley Assocs., Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 504 (6th Cir. 1995). Though the parties undoubtedly showed mutual intent to enter into specific purchase agreements—as

---

[10]Because the Court concludes that the parties had no requirements contract, the Court need not analyze Aleris's alternative argument that, assuming the existence of a requirements contract for an indefinite term, it provided reasonable notice of termination.

[11]Some of the arguments analyzed in Part IV.B regarding the breach of contract counterclaim may have been intended by Valeo to support its breach of contract implied in fact counterclaim. The Court considered all potential evidence of a contract in analyzing the breach of contract claim in the interest of ensuring complete consideration of Valeo's arguments.

evidenced by Valeo's retrieval of product, the issuance of a release based thereon, and Aleris's subsequent invoicing—the Court concludes that, for the reasons previously discussed, the parties failed to show mutual intent to abide by an implied requirements contract that imposed continuing obligations. No such intent can be inferred on Aleris's end especially where Aleris repeatedly refused to execute the 2008-2010 Business Agreement before successful negotiation of a new labor contract. Therefore, the Court grants Aleris summary judgment as to Valeo's breach of contract implied in fact counterclaim.

**C. Promissory Estoppel**

Finally, Valeo argues that, absent a contractual relationship, Aleris's conduct reasonably induced reliance by Valeo. A claim for promissory estoppel arises when there is "(1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided." *Novak v. Nationwide Mut. Ins. Co.*, 235 Mich. App. 675, 686-87, 599 N.W.2d 546, 552 (1999).

Valeo claims that Aleris's expression of intent to enter into the 2008-2010 Business Agreement—and other conduct discussed at length above—induced Valeo's reliance on the existence of a requirements contract. This claim fails as a matter of law.

On June 26, 2008, Aleris sent Valeo a "Letter of Intent" providing:

> This letter of intent is to confirm that Aleris Aluminum Canada will supply Valeo Engine Cooling ("Valeo") Greensburg (USA), Jamestown (USA), Itatiba (Brazil) and San Luis Potosi (Mexico) with specific aluminum requirements for 2008, 2009 and 2010. This agreement is conditional to Aleris finalizing its union labour contract currently under negotiation.

(Valeo's Resp. Ex. 47.) To the extent that Valeo relied on this letter as a promise of a requirements contract, Valeo's reliance was unreasonable. Leading up to the issuance of the Letter of Intent, Valeo had been pushing for a commitment from Aleris. (*See* Valeo's Resp. Ex. 46 ("[W]e cannot continue in this situation with no stability on your side. We need to get a commitment on your behalf, and it needs to be now.").) Even so, Aleris remained unwavering in its position that it would not sign the 2008-2010 Business Agreement without a new labor contract in place. (*See* Valeo's Resp. Exs. 43, 47, 54.) Valeo was aware of Aleris's situation and proceeded at its own risk; it cannot now force a commitment on Aleris that Aleris explicitly refused to make. Therefore, Aleris is entitled to summary judgment on Valeo's promissory estoppel counterclaim.

## V. Conclusion

The totality of the circumstances in this case reveal that there was no requirements contract in place at the time Aleris locked out its union workers. In addition to the fact that the documents failed to evidence a requirements contract, Aleris repeatedly informed Valeo that it was unwilling to enter a new requirements contract until it successfully negotiated a new labor contract. As such, Aleris was free to cease supplying Valeo when its labor negotiations fell through. Meanwhile, Valeo retrieved $1,473,692.24 worth of Aleris products in the summer 2008 for which it has yet to pay. For these reasons, Aleris is entitled to summary judgment on both its breach of contract claim and Valeo's counterclaims.

Accordingly,

**IT IS ORDERED** that Aleris's motion for summary judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that Aleris is awarded $1,473,692.24 plus pre-judgment interest at a rate of 5% per annum as provided for under Michigan law.

A judgment consistent with this order shall enter.

<u>s/PATRICK J. DUGGAN</u>
UNITED STATES DISTRICT JUDGE

Copies to:
Sarah C. Lindsey, Esq.
Daniel W. Linna, Jr., Esq.
Edward T. Sable, Esq.